UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

SAMUEL TAYLOR FREE                              CIVIL ACTION NO. 17-1606

VERSUS                                          JUDGE S. MAURICE HICKS, JR.

LEASA G. WINBORNE                               MAGISTRATE JUDGE HAYES

## MEMORANDUM RULING

Before the Court is an appeal filed by the Appellant, Samuel Taylor Free ("Free"), debtor in the matter of In re: Samuel Taylor Free, USBC, W.D. La., No. 17-30245. See Record Document 1. Free appeals a ruling by the United States Bankruptcy Court, Western District of Louisiana in favor of Appellee, Leasa G. Winborne ("Winborne"), in the underlying adversary proceeding. See Record Document 2-3 at 26.[1] For the reasons assigned herein, the decision of the Bankruptcy Court is hereby **AFFIRMED**.

## BACKGROUND FACTS AND PROCEDURE

Winborne is the widow of James C. Winborne ("Mr. Winborne"), who died on October 30, 2014. See Record Document 4 at 33. Prior to his death, Mr. Winborne and Free were the only members of two real estate companies, each owning 50% of the businesses. See Record Document 2-2 at 42-43, 68-69. Turkey Creek Holding Company, LLC ("TCHC") was formed in 2004 to buy and sell real estate. See Record Document 2-2 at 39. Turkey Creek Appraisal Services, LLC ("TCAS") was formed in 2005 to perform real estate appraisals. See id. at 65.

---

[1] The Bankruptcy Record on appeal is noted as follows: Record Document 2-1 (Adversary Proceeding Documents 1-20; Record Document 2-2 (Adversary Proceeding Documents 21-30); Record Document 2-3 (Adversary Proceeding Documents 31-41); Record Document 4 (Transcript of hearing held November 16, 2017).

Winborne is the sole legatee of Mr. Winborne's estate.  See id. at 91-94.  On January 13, 2014, the Fifth Judicial District Court, Franklin Parish, issued a Judgment of Possession in Mr. Winborne's succession, providing Winborne with possession of her husband's 50% interest in both TCHC and TCAS.  See id. On August 20, 2015, Winborne filed a lawsuit against Free on her own behalf and on behalf of TCHC and TCAS in the Fifth Judicial District Court, Franklin Parish.  See Record Document 2-1 at 25-29.  Winborne alleged that Free wrongfully converted assets belonging to TCHC and TCAS, and withheld her 50% share of the net proceeds.  See id.  Winborne also alleged that Free impersonated her deceased husband to continue performing appraisals before forming a new appraisal company on June 25, 2015.  See id. at 26.  On November 2, 2016, the Fifth Judicial District Court ruled in Winborne's favor.  See Record Document 2-2 at 114-115.  The award included Winborne's share of the TCAS account balance ("$5,725.00), the TCHC account balance ($1,346.00), Winborne's share of the 2015 net profits ($5,000.00), and 50% of the residual value of the two businesses ($30,000.00).  See id.  A judgment consistent with the ruling was issued December 6, 2016 awarding her $42,071.00 plus court costs, expert fees, and legal interest from the date of the judicial demand.  See Record Document 2-2 at 113.   On February 8, 2017, Winborne filed a Writ of Fieri Facias to enforce the judgment.  See Record Document 2-1 at 4.  Shortly thereafter, on February 16, 2017, Free filed for Chapter 13 bankruptcy.  See USBC, W.D. La., No. 17-30245.

Winborne responded by filing the instant adversary proceeding, alleging that the judgment in question is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) (assets obtained by fraud) and 523(a)(6) (assets obtained by willful or malicious injury to

2

another).  See Record Document 2-1 at 1-4.² In response, Free filed a motion to dismiss Winborne's adversary proceeding for failure to state a claim for which relief may be granted.  See id. at 17-24.³ On June 21, 2017, the Bankruptcy Court issued a ruling granting Free's motion as to Winborne's claim that the debt is nondischargeable pursuant to Section 523(a)(2), finding that Winborne's adversary complaint did not allege facts sufficient to establish that Free engaged in "actual fraud" under the test employed in the Fifth Circuit.  See id. at 88-94.  The Bankruptcy Court denied Free's motion as to Section 523(a)(6).  See id.

On November 16, 2017, a hearing was held regarding Winborne's claim pursuant to Section 523(a)(6).  See Record Document 4.  Free and Winborne both testified, providing their respective version of events.  See id.  Thereafter, on November 29, 2017, the Bankruptcy Court issued a judgment and memorandum opinion finding that

---

² 11 U.S.C. § 523 – Exceptions to Discharge
    (a)    A discharge under [ ] this title does not discharge an individual debtor from any debt –
        [. . .]
        (2)    for money, property, service, or an extension, renewal, or refinancing of credit, to the extent obtained by—
            (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.
        [. . .]
        (6)    for willful and malicious injury by the debtor to another entity or to the property of another entity.

³ The Bankruptcy Court considered Free's motion pursuant to Rule 12(b)(6), although Free's motion did not reference a particular rule.

3

the Fifth Judicial District Court's judgment in favor of Winborne is a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(6). See Record Document 2-3 at 27-38.[4]

The Bankruptcy Court began its analysis by noting that the operating agreements of TCHC and TCAS each contain the following information: (1) Free and Mr. Winborne were the initial members of both LLCs; (2) each had a sharing ratio of 50%; (3) each provided an initial contribution of $1000 per LLC; and (4) the terms for the dissociation of a member. See id. at 28. The operating agreements also provide that upon a member's death, that member's successor would become an assignee of the deceased member's interests in the companies. See id. at 28, 56, and 82.[5] Per the terms of the operating agreements, an assignee has no management rights and the member from whom the assignee acquired its interest retains their voting rights until such time as the

---

[4] The Bankruptcy Court determined that it could only decide whether the entire amount of the judgment was nondischargeable, not individual portions thereof. See Record Document 4 at 7-8. Neither party has briefed this Court as to whether the Bankruptcy Court should have considered the subparts of the award separately. Accordingly, all issues not raised are waived and will not be entertained on appeal. See Christian v. Pacific Western Bank, 581 B.R. 797, 803 (Bankr. E.D. Tex. 2017)(citing United Paperworkers Int'l Union AFL-CIO, CLC v. Champion Int'l Corp., 908 F.2d 1252, 1255 (5th Cir. 1990)).

[5] Both operating agreements contain identical clauses regarding the rights of assignees, as follows:

> An assignee shall have no management rights. The assignee shall receive only the economic rights to which the assignee otherwise would be entitled if the assignee were a Member. The Member from whom the assignee acquired its interest shall continue to have all voting rights of a member until the assignee is admitted as a Member. However, if the transfer to the assignee was made in violation of the terms of this Operating Agreement, then neither the assignee nor the Member from whom the assignee acquired its interest shall have any voting rights.

See Record Document 2-2 at 56 and 82. There has been no allegation that Winborne acquired her rights as an assignee in violation of the terms of the operating agreements.

assignee is admitted as a Member. See id. Thus, the Bankruptcy Court concluded that per the terms of the operating agreements, when Winborne became an assignee through succession Mr. Winborne retained his voting rights, although he obviously could not exercise such rights. See id. at 29.[6]

Free argued to the Bankruptcy Court that he was not required to pay Winborne her portion of the 2015 business income because he decided to dissolve both entities after Mr. Winborne's death in October 2014. See id. The Bankruptcy Court found the issue of voting rights to be particularly relevant to Free's argument that he had authority to unilaterally dissolve both entities as the only remaining voting member. See id. at 29-30. Each operating agreement contained the following clause regarding dissolution:

12.1 Events of Dissolution

The Company shall be dissolved upon the occurrence of any one of the following events:

(a) expiration of the Company's term;
(b) entry of an order for relief with respect to the Company under Chapter 7 of the Bankruptcy Code;
(c) entry of a judgment of dissolution of the Company pursuant to La Rev Stat Ann section 12:1335; and
(d) consent to dissolve the Company by a Majority in Interest of the Members.

See Record Document 2-2 at 57-58, 83-84.[7] Free testified that dissolution of both entities had occurred because, as the sole remaining member, he could unilaterally

---

[6] This Court notes that the operating agreements do not specifically address the status of a deceased member's voting rights.

[7] This Court notes the inherent inconsistency of section 12.1 as it is written caused by the use of the words "any one" in the introductory phrase and the word "and" between paragraph (c) and (d). Section 12.1 can arguably be interpreted two different ways: (1) the occurrence of either (a), (b), (c), or (d) will dissolve the entity; or (2) alternatively, the occurrence of either (a), (b), (c), and the occurrence of (d) will dissolve the entity.

5

consent to dissolution under paragraph (d). See Record Document 2-3 at 29. However, the Bankruptcy Court determined that Free did not account for Mr. Winborne's remaining voting rights, noting that per the terms of the operating agreements Free did not have a Majority in Interest because his share was only 50%. See id. at 30. Thus, Free lacked the authority to unilaterally dissolve either entity. See id. The Bankruptcy Court also found that dissolution could not have occurred because there was not a judgment of dissolution regarding either entity pursuant to La. Rev. Stat. 12:1335, which the Bankruptcy Court interpreted as a mandatory requirement of section 12.1 of the operating agreements. See id.[8] Based on the above, the Bankruptcy Court concluded that both TCHC and TCAS continued to be in existence after Mr. Winborne's death, and were not legally dissolved at the time of the bankruptcy hearing. See id. [9]

The Bankruptcy Court found that following Mr. Winborne's death Free continued to do business as TCAS, noting that TCAS bank statements continued to show deposits into the account for appraisal services. See id. at 31. The Bankruptcy Court also found that Free accepted checks payable to TCAS, which he either cashed or deposited into accounts unassociated with TCAS, personally spending the funds without paying Winborne her 50% share as an assignee. See id. The Bankruptcy Court dismissed Free's argument that he had merely paid bills and employees with the unaccounted TCAS funds, noting that there was no documentary proof of such actions. See id. The

---

[8] This Court does not agree that the plain language of section 12.1 requires an entry of judgment pursuant to La. Rev. Stat. 12:1335. However, this issue of interpretation is not dispositive to the case.

[9] Free argues that the logic of the Bankruptcy Court would render him perpetually bound to support Winborne. See Record Document 8 at 3. This is not accurate because at any point Free could have filed a petition to dissolve the LLCs pursuant to La. Rev. Stat. 12:1335.

6

Bankruptcy Court found that Free intentionally breached the operating agreements by commingling TCAS funds with personal funds. See id. The Bankruptcy Court also found that Free breached the operating agreements by signing checks greater than $300.00 without the proper authority. See id. The Bankruptcy Court also found that Free intentionally breached the TCAS operating agreement by retaining 100% of the proceeds, ignoring Winborne's ownership interest as an assignee in TCAS per the judgment of possession in Mr. Winborne's succession. See id. at 31, 33. Finally, the Bankruptcy Court found that Free converted both account funds and other LLC assets for his personal and exclusive use. See id. at 33. The Bankruptcy Court held that Free's retention of 100% of TCAS profits after Mr. Winborne's death was intentional, willful, and malicious. See id. at 33.

The Bankruptcy Court also made a finding that Free was an unreliable witness, noting that his testimony was impeached by his deposition and that his answers were often contradictory and evasive. See id. at 31. In contrast, the Bankruptcy Court found the testimony of Winborne to be primarily consistent and free from any major inconsistencies. See id. at 32. Given that the case turned on the veracity of two competing witnesses, the Bankruptcy Court chose to believe Winborne. See id.

The Bankruptcy Court then determined that the state court judgment in favor of Winborne is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). See id. at 34. The Bankruptcy Court concluded Winborne had demonstrated by a preponderance of the evidence that Free intentionally diverted Winborne's property interests in the funds and assets of TCAS and TCHC, which was substantially certain to cause her harm, and that Free intended to cause such harm. See id. at 34-35. The Bankruptcy Court also made

a specific finding that Free's conduct was "willful and malicious" under 11 U.S.C. § 523(a)(6), and was not merely negligent or unintentional. See id. at 35.

## LAW AND ANALYSIS

I.  **Standard of Review**

In reviewing a decision by the Bankruptcy Court, this Court applies the standards of review generally applied in federal appellate courts. See In re Webb, 954 F.2d 1102, 1103-04 (5th Cir. 1992). This Court reviews the Bankruptcy Court's legal conclusions de novo, and findings of fact for clear error. See In re ASARCO, LLC, 702 F.3d 250, 257 (5th Cir. 2012). A finding of fact is clearly erroneous only if "on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed." In re Dennis, 330 F.3d 696, 701 (5th Cir. 2003) (quoting In re Perez, 954 F.2d 1026, 1027 (5th Cir. 1992)). Findings of fact "based on determinations regarding the credibility of witnesses demand even greater deference because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." In re Renaissance Hosp. Grand Prairie Inc., 713 F.3d 285, 293 (5th Cir. 2013) (quoting Anderson v. Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504 (1985)).

II.  **Exception to Discharge pursuant to 11 U.S.C. § 523(a)(6)**

The Bankruptcy Code provides several categories of debts that are exempt from discharge. See 11 U.S.C. § 523(a). To prevail, a creditor must establish by a preponderance of the evidence that a debt is not dischargeable. See Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991). "Discharge exceptions are to be

narrowly constructed in favor of the debtor since the aim of the Bankruptcy Code is to give the debtor a fresh start." In re Miller, 156 F.3d 598, 602 (5th Cir. 1998).

Specific to the case at hand, 11 U.S.C. § 523(a)(6) provides that a debtor may not discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Fifth Circuit has determined that a "willful and malicious injury" is one "where there is either an objective substantial certainty of harm, or a subjective motive to cause harm." In re Miller, 156 F.3d at 606. Conduct that is merely negligent or reckless is not sufficient to prove nondischargeability under Section 523(a)(6). See Kawaauhau v. Geiger, 523 U.S. 57, 64, 118 S.Ct. 974, 978 (1998). "Injuries covered by Section 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by Section 523(a)(6)." In re Beveridge, Nos. 08-04096, 08-04114, 2009 WL 2591143, at *11 (Bankr. N.D. Tex. Aug. 18, 2009) (citing 4 Collier on Bankruptcy ¶ 523.12(4) (15th ed. 2003)). The willful conversion of another's property also falls within Section 523(a)(6). See id.

Free argues on appeal that the Bankruptcy Court erred in finding his actions to be willful and malicious as required by Section 523(a)(6). See Record Document 8. In support thereof, Free notes that he testified that it was his belief and understanding that Mrs. Winborne could not inherit 50% of the partnership upon the death of her husband. See id. at 2.[10] Under cross-examination Free was asked to read his prior testimony concerning how he arrived at this understanding, to which Free responded: "I made it up." See Record Document 4 at 11-12. Free also testified that he felt as though he should get all of the income generated from appraisal work occurring after Mr.

---

[10] TCAS and TCHC were established as LLCs, not partnerships. See Record Document 2-2 at 39, 65.

9

Winborne's death because he had performed all of the work. See id. at 18. Thus, Free argues that his retention of money he believed rightfully belonged to him, based on work he performed, cannot constitute an intended injury to Winborne. See Record Document 8 at 2.

In response, Winborne argues that Free's "belief" that he was entitled to all of the proceeds from the business should not control the analysis because the Bankruptcy Court made a specific finding that Free's testimony was not credible. See Record Document 9 at 3. Winborne also argues that evidence introduced at the hearing indicates that Free committed the tort of conversion by intentionally depriving her of her property interests without authority. See Record Document 9 at 3 (citing McIntyre v. Kavanaugh, 242 U.S. 138, 37 S.Ct. 38 (1916)). Winborne notes that TCAS' account ledger indicates that over $90,000.00 of revenue was generated after the death of her husband, and Free admitted that TCAS' gross revenues exceeded $100,000.00. See Record Document 9 at 3; Record Document 2-2 at 97-112 (Plaintiff's Ex. 12 and 13); Record Document 4 at 12. However, despite the large amount of revenue generated, less than $20,000.00 was deposited into the TCAS bank account. See Record Document 9 at 3; Record Document 4 at 13. Thus, Winborne maintains that Free hid over $70,000.00 in revenue by "putting it into his own pocket," which demonstrates malicious intent. See Record Document 9 at 3. Winborne argues that if Free truly believed he was entitled to all of the money, he would have deposited it into the company account. See id. Although Free claimed that he used the funds for company business expenses, Winborne notes that Free also testified that he used TCAS funds to repair and pay for a car titled in his son's name, not the company's name. See id.;

Record Document 4 at 20. Winborne also notes that Free has maintained throughout the entire litigation that he was not going to pay her 50% of TCAS' income. See Record Document 9 at 3; Record Document 4 at 18. Despite Free's refusal to pay, Winborne notes that she paid 50% of the business taxes for TCAS in 2015 although she received no income. See Record Document 9 at 4; Record Document 4 at 48-49.

Upon review of the record, this Court agrees with the Bankruptcy Court's finding that Free caused a willful and malicious injury to Winborne pursuant to Section 523(a)(6), such that the state court judgment is a nondischargeable debt. Clearly, when Free made the decision not pay Winborne her portion of the proceeds from the business entities there was an objective and substantial certainty of harm to her. Every dollar wrongfully converted by Free for his own benefit was also a dollar intentionally kept from Winborne. This Court also agrees with the Bankruptcy Court's observation that Free was aware of the terms of the operating agreements, but ignored the terms when they did not benefit him. See Record Document 2-3 at 33. Per the terms of the operating agreements, Free paid Winborne her 50% share of the profits generated prior to Mr. Winborne's death, yet he intentionally violated the terms of the same operating agreements and converted Winborne's 50% share of the profits generated after Mr. Winborne's death.

Free's "belief" that he could keep all of the profits generated by the companies for himself after Mr. Winborne's death is contradicted by the terms of the operating agreements he signed. Likewise, Free's contention that he was not required to pay Winborne for her portion of the 2015 income because he unilaterally decided to dissolve the entities is also unpersuasive. While the Bankruptcy Court focused on the issue of

voting rights to reach the conclusion that the entities were never dissolved, this Court notes that the underlying state court judgment is sufficient to determine the issue. Therein, the state court determined that Winborne was entitled to her share of the 2015 profits up to June 25, 2015, when TCAS business ceased. See Record Document 2-2 at 115. For the debt to be owed to Winborne, the state court had to conclude that the business was not dissolved immediately after Mr. Winborne's death as Free argues.

Moreover, for this Court to accept Free's explanation that he believed he did not owe Winborne her 50% share it must overrule the Bankruptcy Court's finding regarding Free's lack of credibility. A review of the record does not support such a conclusion. The record indicates that Free did not want to pay Winborne her 50% share as an assignee after her husband's death, so he chose not to do so in violation of the operating agreements. The Court also notes that Winborne testified that she paid 50% of the business taxes in 2015 in the amount of $2000-$3000. See Record Document 4 at 49. When Free was questioned as to whether he only paid 50% of the business tax in 2015, he responded that he "could not recall." See id. at 29. Given Free's credibility issues, it appears that Winborne paid 50% of the business taxes for 2015, yet she received 0% of the net profits. This testimony further supports the conclusion of the Bankruptcy Court that Free's actions were intentional and were substantially certain to cause to Winborne harm.

Next, Free argues that the debt should be dischargeable because the state court judgment awarding Winborne half the value of the companies' assets and interests did not suggest intentional misconduct on his part. See Record Document 8 at 4. Congress has given "the Bankruptcy Court exclusive jurisdiction to determine

bankruptcy dischargeability [ ]." In re Shuler, 722 F.2d 1253, 1254 (5th Cir. 1984). However, the doctrine of collateral estoppel may apply "in a dischargeability proceeding to preclude relitigation of state court findings that are relevant to dischargeability." In re Gupta, 394 F.3d 347, 349 (5th Cir. 2004). "Collateral estoppel applies in bankruptcy courts only if, *inter alia*, the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question – that is, an issue which encompasses the same prima facie elements as the bankruptcy court issue – and the facts supporting the court's findings are discernible from the court's record." Matter of Dennis, 25 F.3d 274, 278 (5th Cir. 1994).

This court finds that the Fifth Judicial District Court's "Reasons for Judgment" did not address whether Free caused a willful and malicious injury to Mrs. Winborne, nor did the ruling consider whether Free's actions were committed with a substantial certainty of harm or a subjective motive to cause harm. Accordingly, this Court does not find the state court judgment to be a bar to the Bankruptcy Court's dischargeability determination within its exclusive jurisdiction under the Bankruptcy Code.

Finally, Free argues that the factual allegations regarding the conversion of company profits support a derivative claim for alleged injuries to the companies, not Winborne personally, which precludes a finding by the Bankruptcy Court that he intended to injure Winborne individually. See Record Document 8 at 5. Moreover, Free argues that the state court's judgment solely in favor of Winborne and not in favor of the companies is a rejection of "the entire concept of conversion of company assets." See id. Winborne responds by noting that Free did not appeal the state court judgment,

which precludes him from making such an argument before the Bankruptcy Court. See Record Document 9 at 5.

The record reflects that Winborne originally filed suit in state court against Free both individually and on behalf of TCAS and TCHC. See Record Document 2-1 at 25. Thus, Winborne asserted both direct and derivative claims in her state court petition. The state court issued its judgment in favor of Winborne without delineating whether the award was to Winborne for her personal injuries or in her capacity as the representative of TCAS and TCHC. See Record Document 2-2 at 113. However, this Court does not find the lack of specificity of the award to be particularly relevant to the issue of the dischargeability of the judgment. Regardless of whether the conversion of the companies' profits and assets was technically a tort against the companies, the only party capable of being injured was Winborne. In her position as an assignee, and as the possessor of Mr. Winborne's ownership interests, Winborne was to be the ultimate recipient of 50% the converted profits. Clearly, Free was aware that any funds not deposited into the business accounts would only injure Winborne because she was the only other individual entitled to receive the funds. This is not a situation where multiple stockholders or members were harmed by Free's conversion.

Free's insistence that he would not pay Winborne, although she was entitled to payment as an assignee, combined with his enrichment at her expense is consistent with a malicious and intentional act as contemplated by Section 523(a)(6). As such, this Court must agree with the finding by the Bankruptcy Court that the judgment of the Fifth Judicial District Court is nondischargeable.

**CONCLUSION**

Accordingly, for the reasons assigned herein, the decision of the Bankruptcy Court is hereby **AFFIRMED**.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 6th day of September, 2018.

                                          _____
                                          S. MAURICE HICKS, JR., CHIEF JUDGE
                                                  UNITED STATES DISTRICT COURT